1   Steve W. Berman (*pro hac vice* application to be filed)
    Thomas E. Loeser (202724)
2   HAGENS BERMAN SOBOL SHAPIRO LLP
    1918 Eighth Avenue, Suite 3300
3   Seattle, WA 98101
    Tel: (206) 623-7292
4   Fax: (206) 623-0594
    steve@hbsslaw.com
5   toml@hbsslaw.com

6   Shana E. Scarlett (217895)
    HAGENS BERMAN SOBOL SHAPIRO LLP
7   715 Hearst Avenue, Suite 202
    Berkeley, California 94710
8   Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
9   shanas@hbsslaw.com

10  *Attorneys for Plaintiffs*

11  [Additional counsel on signature page]

12

13

14

15                  UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17  DONTE CHEEKS, EMMA SUE CLYATT,
    DEBORAH HORTON, AND RICHARD
18  PIERCE, on behalf of themselves and all others
    similarly situated,
19
                                            No. CV 13 1854
20              Plaintiffs,
                                            CLASS ACTION COMPLAINT
21       V.                                 AND JURY DEMAND

22  FIDELITY AND DEPOSIT COMPANY OF
    MARYLAND AND PLATTE RIVER
23  INSURANCE COMPANY, as sureties for
    MERACORD LLC,
24
                Defendants.
25

26

27

28

1.     Many Americans suffered – and continue to suffer – extreme financial and emotional hardships as a result of the recent financial crisis dubbed the "Great Recession." From these difficult times rose a highly profitable industry purporting to provide "debt relief" to financially troubled and over-extended consumers struggling to pay their credit card, student loan, and mortgage debts. While there are, no doubt, some companies in the debt relief industry that provide genuine assistance to consumers, there are also countless bad actors who see a consumer in financial distress as just another mark. Meracord, formerly known as NoteWorld, LLC, is a perfect example of the latter. To Meracord and its network of co-conspirators, the Great Recession offered not hardship, but windfall profits through exploitation of those suffering financial distress.

2.     Meracord engages and relies upon a network of "front-end" debt relief companies ("Front DRCs") that it utilizes to recruit customers. The Front DRCs offer to act as intermediaries between distressed and distraught debtors and their creditors, using inflated claims and misrepresentations about their services to sign up customers, and charging exorbitant, abusive, and often illegal fees once the mark is on the hook. The Front DRCs require customers to set up an escrow account into which the customer makes a monthly deposit, generally via an automatic electronic funds transfer. These accounts are administered by Meracord, which is a "back-end" debt relief company. In theory, the Front DRC will "negotiate" with creditors in order to modify or lower a customer's debt obligations and use the funds in the escrow account to pay the creditors on behalf of the customer. In the case of credit card and student loan debts, the Front DRCs promise that once a sufficient balance accumulates in the escrow account, the Front DRCs will approach creditors and utilize the accumulated balance to settle outstanding debts for a lump sum. In the case of mortgage debt, the Front DRCs claim they can negotiate a mortgage modification that will lower the customer's monthly payments, and that the funds in the escrow account will go towards those new lower payments. The reality, however, is very different from these promises.

3.     The Front DRCs and Meracord represent to consumers that Meracord is independent and unaffiliated with the Front DRCs, and that consumers will at all times have control over their money. Linda Remsberg – Meracord's owner, President, and CEO – calls

1    Meracord "an objective third party processor" on her blog. These statements are false. In fact,

2    Meracord is deeply intertwined with, and actively conspires with, the Front DRCs. For most of the

3    Front DRCs, Meracord provides software through which consumers view their account balances

4    and have the ability to "approve or decline" settlement agreements with their creditors – if any are

5    actually ever reached. This software in many cases represents the bulk of the "services" that the

6    Front DRC actually provides.

7        4.      Despite its statements to the contrary, Meracord does not act as an independent

8    fiduciary. Together with its network of Front DRCs, it loots customers' escrow accounts by

9    withdrawing exorbitant and abusive fees pursuant to contracts that are wholly fraudulent because

10   they are obtained by means of: (1) false representations, including guarantees about consumers'

11   debts being settled for "pennies on the dollar"; (2) promises that the DRCs will be able to modify

12   the terms of consumers' mortgages even when the lender has previously rejected modification

13   requests; (3) misleading statements about the success rates of the debt relief services; and (4)

14   assurances that Meracord – the entity actually withdrawing funds from consumers' accounts – is an

15   "independent" third party. In many cases, the customers are told to stop making payments to their

16   creditors – and even encouraged to stop making payments in order to show their "financial

17   hardship" – in order to pay the exorbitant fees charged by the DRCs, resulting in creditors initiating

18   lawsuits and foreclosure proceedings – leaving the customer in a worse position than before the

19   DRCs offered to "help."

20       5.      If consumers discover the fraud and attempt to retrieve the illegally extracted fees,

21   they often find that the Front DRC is completely unresponsive, or, worse, is nothing more than a

22   shell entity with no real address and no discernible ownership structure. Meracord, for its part,

23   stonewalls customers and refuses to refund illegal fees, hiding behind false claims that it "only"

24   provides "payment processing" services; that it is "not a debt settlement company;" and that it is

25   wholly "independent" from the suddenly unavailable (or vanishing) Front DRCs. By the time

26   Meracord actually closes a customer's escrow account, the customer will have lost hundreds or

27   thousands – and in some cases tens of thousands – of dollars in unlawful charges.

28

CLASS ACTION COMPLAINT
AND JURY DEMAND                                    -2-
010262-15 603905 V1

6.      The "churn" rate in Meracord's debt relief payment servicing accounts (cancelled accounts as a percentage of active accounts) approaches 70% – a clear and objective indication that the vast majority of its business activity is wholly fraudulent. If Front DRCs were actually performing debt relief services, the vast majority of their consumers would not cancel their accounts before their debts were renegotiated.

7.      Although Meracord claims that it is not a debt settlement company, the online account management tool that Meracord makes available specifically has a section entitled "Settlements," where customers can "get more details about [pending settlement agreements] and . . . approve or decline the proposed agreement[s]."

8.      Plaintiffs' experiences are typical of the harm suffered by victims of Meracord and its co-conspirators. All Plaintiffs were in financial distress, and all were fraudulently induced to sign up for debt relief services that they believed would help them to finally dig themselves out of debt. As part of its "services," Meracord withdrew tens of thousands of dollars from Plaintiffs' bank accounts, which Plaintiffs believed would be used to pay their creditors under the more favorable terms supposedly being negotiated by the Front DRCs. By the time Plaintiffs realized that nothing was actually being done to negotiate their debts, it was too late. Meracord had already taken exorbitant fees for itself and the Front DRCs out of Plaintiffs' escrow accounts. If Plaintiffs demanded that their money be returned, they faced stonewalling by Meracord and the Front DRCs, and often the Front DRC simply stopped responding altogether. Plaintiffs ultimately lost hundreds – and in most cases, thousands – of dollars to Meracord and the Front DRCs, and ended up even *more* in debt than they were when they originally sought help.

9.      As a money transmitter and escrow agent, Meracord is required to post surety bonds in many states to insure against its liability for wrongful acts committed in the course of its business. Consumers like Plaintiffs are the intended beneficiaries of these surety bonds.

10.     Plaintiffs bring this action to recover, from Meracord's surety bonds, damages caused by Meracord's illegal conduct. Plaintiffs bring this action on behalf of themselves and a Class, as defined below, of similarly situated persons.

CLASS ACTION COMPLAINT
AND JURY DEMAND                                    - 3 -
010262-15 603905 V1

# I.   JURISDICTION AND VENUE

11.   This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). Meracord's website boasts that it carries "over $17 million in Surety Bonds." Therefore, based on information and belief, the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and is a class action composed of more than 100 members and in which at least one Class member is a citizen of a state different from that of Defendants. This Court has jurisdiction over the RICO claim pursuant to the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) (civil remedies for RICO violations).

12.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because events that gave rise to the claims occurred in substantial part in this judicial district and a substantial part of property that is the subject of the action is situated in this judicial district. Specifically, on information and belief, Defendant Fidelity & Deposit Company of Maryland issued a surety bond pursuant to California Financial Code § 2037 in favor of Meracord. On information and belief, the bond is on file at the headquarters of the California Department of Financial Institutions located at 45 Fremont Street, Suite 1700, San Francisco, CA 94105-2219.

13.   In addition, venue is proper because Meracord has marketed its fraudulent debt relief services within this district.

14.   This Court has personal jurisdiction over Defendants.

15.   Defendant Fidelity & Deposit Company of Maryland has transacted business in this district by issuing a surety bond pursuant to California Financial Code § 2037. Fidelity & Deposit Company of Maryland regularly transacts business within this district, including providing surety bonds in connection with construction projects undertaken in this district.

16.   Defendant Platte River Insurance Co. is registered with the California Department of Consumer Affairs as a surety company and lists the location of its office as 2121 N. California Blvd, Suite 300, Walnut Creek, CA. Defendant Platte River Insurance Co. regularly transacts business within this district, including providing surety bonds in connection with construction projects undertaken in this district.

17.     Intradistrict Assignment:  Assignment to either the San Francisco or Oakland divisions of this District is proper because a substantial portion of the events giving rise to the claims occurred therein and Defendants regularly transact business within this District.

## II.     PARTIES

### A.     Defendant Sureties

18.     Defendant Fidelity & Deposit Company of Maryland is an insurance company that issues regulatory and contractual surety bonds. It has issued surety bonds for the use and benefit of claimants against Meracord in, among other states, Arizona, California, Missouri and Washington State.

19.     Defendant Platte River Insurance Co. is an insurance company that issues regulatory and contractual surety bonds. It has issued surety bonds for the use and benefits of claimants against Meracord in, among other states, Arkansas, Florida, Virginia and North Carolina.

### B.     Plaintiff Obligees

20.     Plaintiff Donte Cheeks is a resident of Washington, DC. Mr. Cheeks signed up for the debt relief services of Meracord and New Life Financial. As a result, he was defrauded of thousands of dollars by Meracord and its co-conspirators and accomplices.

21.     Plaintiff Deborah Horton is an Arkansas resident. Ms. Horton signed up for the debt relief services of Meracord and Debt Source Solutions. As a result, she was defrauded of thousands of dollars by Meracord and its co-conspirators and accomplices.

22.     Plaintiff Richard Pierce is a California resident. Mr. Pierce signed up for the debt relief services of Meracord and 1st United Consultants. As a result, he was defrauded of thousands of dollars by Meracord and its co-conspirators and accomplices.

23.     Plaintiffs are obligees of surety bonds issued by Defendants in Plaintiffs' states of residence.

### C.     Surety Principal and Tortfeasor

24.     Meracord, LLC ("Meracord") is the principal for whom Defendants act as sureties. Meracord is a Delaware limited liability company with its principal place of business in Tacoma,

Washington. According to its Sign-Up Agreement, Meracord "is in the business of providing transaction management and processing services and certain related services as an independent third party," and its website touts its aim "to be the most respected 3rd party payment service provider in the world, where there is a written promise that dictates the responsible and accurate treatment of the payment."

25.    Meracord was formerly known as NoteWorld. After a number of class action lawsuits were filed against NoteWorld, the company changed its name to Meracord. Frequent name changes are a common tactic in the debt relief industry. By changing names, companies in the industry are able to wipe clean their online reputations virtually overnight, making it more difficult for consumers to associate the companies with lawsuits and other negative consumer feedback. In this Complaint, Plaintiffs refer to "Meracord," although many of the events described herein took place when the company was called "NoteWorld."

26.    Meracord has conspired and/or currently conspires with scores (if not hundreds) of front-end debt relief companies ("Front DRCs"), who together with Meracord compose the Meracord Enterprise. Those Front DRCs include at least the following entities: 1UC/1st United Consultants/First United Consultants, Debt Solutions, Debt Source Solutions, New Life Financial Solutions/New Life Financial/New Life Financial Services, Lloyd Ward and Associates, Express Debt Settlement Holdings, Law Office of Simon & Bocksch, EMA Nationwide Inc./EMA/Expense Management America Freedom Debt Relief, First Rate Debt Solutions, Expert Settlement Professional, P&E Solutions, Freedom Debt Center, Accredited Financial Corporation, Amber Network Inc., Best Debt Options, Beyond Financial Service, Brite Credit Inc. (d/b/a Brite Credit 123), Century Negotiations Inc., Clear Debt Solution, Coastal Debt Solutions LLC, Consumerwise Debt Solutions Inc., Counsel 4 Debt Relief, Countrywide Debt Solutions Inc., Credit Care Corporation, CreditCare Pro, Debt Help Center USA, Debt National Relief, Debt Reinvestment, Debt Solutions, Debt Erase Inc., DebtPointer Inc., DebtPro LLC, DTS Financial Group, E.A.C. Financial LLC, FBL Associates, Freedom Debt Solutions, Help Settle LLC, Helpsettle.com, Innovative Debt Solutions, Lifeguard Financial, Maximum Debt Solutions, Morgan Stevens

1    Financial Solutions Company, National Financial Freedom LLC, Nationwide Consumer Advocacy

2    Group, On Track Financial LLC, Personal Debt Systems of America, Princeton Debt Management

3    LLC, Reduce My Debt LLC, Settle A Debt Inc., Settlement Corporation of America, SilverLeaf

4    Debt Solutions, The Debt Answer, The Debt Cure, US Consumer Report, Vision Debt.com and

5    World Debt Solutions.

6          27.    Many of these Front DRCs have been the subject of state and federal investigations

7    for consumer fraud. In addition, many of the companies, while maintaining separate legal

8    existences and presenting themselves to consumers as separate entities, are in fact owned and

9    operated by the same individuals. For example, as alleged in a 2012 complaint filed by the Federal

10   Trade Commission, the two Front DRCs that victimized Plaintiffs Donte Cheeks and Richard

11   Pierce – New Life Financial and First United Consultants – are actually part of a common

12   enterprise run by a handful of individuals who own and operate multiple Front DRCs.

13         28.    Meracord acknowledges on its website that it is a "relatively small company" facing

14   "costly challenges." That is an understatement.  Meracord is a defendant in numerous cases around

15   the country, including but not limited to: *Rajagopalan v. NoteWorld*, No. 3:11-cv-05574 (W.D.

16   Wash., Filed July 26, 2011); *Canada v. Meracord*, No. 3:12-cv-05657 (W.D. Wash., Filed July 24,

17   2012); *Fritts v. Debt Resolution Center*, No. CIVMSC12-02292 (Contra Costa Cty. Superior Ct.,

18   Filed Sept. 27, 2012); *Knotts v. Meracord*, No. 4:13-cv-00358-MGL (D. S.C., Filed Feb. 8, 2013);

19   and *Lomax v. Meracord*, No. 2:13-cv-01945-SRC-CLW (D. N.J., Filed Feb. 22, 2013).

20         29.    Meracord has recently settled at least two additional cases that have severely

21   depleted its available assets, including insurance policies. These cases are *Burke v. NoteWorld*, No.

22   1:11-cv-00029-JRH –WLB (S.D. Ga., Filed Feb. 25, 2011) and *Wheeler v. NoteWorld*, No. 2:10-

23   cv-00202-LRS (E.D. Wash., Filed June 24, 2010).

24         30.    Meracord has been sued by at least one of its insurers, Lloyds of London, and that

25   action is currently pending in the Western District of Washington.

26

27

28

CLASS ACTION COMPLAINT
AND JURY DEMAND                                    - 7 -
010262-15 603905 V1

31.     In light of the above and in light of the magnitude of damages suffered by Plaintiffs and the class, on information and belief, Meracord lacks the resources to compensate Plaintiffs and class members for the injuries alleged below.

### III.     FACTS

**A.     The Debt Relief Industry**

32.     As the economy has declined in recent years, the number of Americans unable to pay their debts has increased, bringing a concurrent increase in the number of companies (both nonprofit and for-profit) offering to help consumers manage or eliminate those debts.

33.     Debt relief companies purport to assist consumers by acting as intermediaries between a consumer and his or her creditors, and charge fees to "negotiate" with creditors in the hopes of getting the creditors to settle for less than the full amount of the consumer's debt or otherwise modify the terms of that debt.

34.     The Front DRC's operate by requiring that a consumer agree to have a specific monthly (or semi-monthly) payment automatically deducted from the consumer's account and sent into a specified "escrow" account at Meracord, which is not under the consumer's direct control. The monthly payment is used to pay fees to both the Front DRC and Meracord – indeed, generally those fees consume the bulk, if not the entirety, of the customer's payments for at least the first few months, if not longer. When a Front DRC is attempting to settle credit card or student loan debt, it promises that the remaining amount will go towards accumulating money to provide a "lump sum" amount which the debt settlement company can use to negotiate with creditors in order to lower the overall amount required to satisfy the consumer's debt. When a residential mortgage is involved, the remaining money ostensibly goes towards making the promised new, lower mortgage payments ostensibly negotiated with the lender.

35.     Individuals suffering from debt-related troubles may be among the most vulnerable consumers, due to the inherent emotional stress of carrying seemingly insurmountable debt loads – a stress compounded by the harassment suffered by many debtors at the hands of collection agencies. Despite the passage of the Fair Debt Collection Practices Act, many collectors continue

1   to subject indebted consumers to a deluge of harassing and harrowing phone calls and letters

2   demanding payment of debts and threatening dire consequences, resulting in an increasing sense of

3   desperation experienced by many debtors. This desperation may be even worse in the case of

4   homeowners struggling to pay their mortgages, who face the ever-present threat not just of

5   harassment and lawsuits, but of losing their homes. Add to this emotionally charged setting a debt

6   relief company promising to "make it all go away," and an environment rife with fraud and

7   consumer exploitation emerges.

8       36.     Indeed, many states, along with multiple federal government agencies and consumer

9   advocates, have recognized the rampant abuses taking place in the for-profit debt relief industry,

10  and have taken steps to curb such abuses.

11      37.     In the last few years, the Federal Trade Commission ("FTC") issued new

12  regulations prohibiting the very practices described herein, which include charging advance fees

13  for debt settlement or mortgage relief services, as well as misrepresenting the nature and details of

14  the services to be provided. In describing the rationale for its advance fee ban in the debt settlement

15  industry, the FTC noted:

16          Consumers in the midst of financial distress suffer monetary harm –
            often in the hundreds or thousands of dollars – when, following sales
17          pitches frequently characterized by high pressure and deception, they
            use their scarce funds to pay in advance for promised results that, in
18          most cases, never materialize.

19  FTC Telemarketing Sales Rule, 75 Fed. Reg. 153, 48482 (August 10, 2010). With respect to

20  mortgage modification schemes, the FTC further noted:

21          [I]t appears that the vast majority of consumers do not receive the
            results MARS providers promise. After collecting their up-front fees,
22          MARS providers often fail to make initial contact with the
            consumer's lender or servicer for months, if at all, or to have
23          substantive discussions or negotiations with the lender or servicer. In
            many cases, MARS providers fail to perform even the most basic
24          promised services or achieve any beneficial results. In some cases,
            providers also cause harm to consumers by instructing them to stop
25          communicating with their lenders and servicers.

26  FTC Mortgage Assistance Relief Services Final Rule. 75 Fed. Reg. 230, 75097 (December 1,

27  2010).

28

CLASS ACTION COMPLAINT
AND JURY DEMAND                    - 9-
010262-15 603905 V1

38.     In 2010, the Government Accountability Office ("GAO") issued a report on the for-profit debt settlement industry. Bearing the illustrative title "DEBT SETTLEMENT: Abusive, and Deceptive Practices Pose Risk to Consumers," the report outlined the GAO's investigation of 20 debt settlement companies, in which GAO staff members had posed as indebted consumers. The GAO "found the experiences of its fictitious consumers to be consistent with widespread complaints and charges made by federal and state investigators on behalf of real consumers against debt settlement companies engaged in fraudulent, abusive, or deceptive practices."

**B.     The Meracord Enterprise**

39.     In order to vastly grow its customer base, while shielding itself from the scrutiny and complaints of those it defrauds, Meracord partners with an elaborate network of Front DRCs. Meracord uses the Front DRC network to sign up desperate and unsuspecting consumers who are looking for relief from the overwhelming stress of their indebtedness.

40.     Typically, a consumer will sign up with a Front DRC representing itself as a single debt relief company. Front DRCs seek customers through unsolicited phone calls, email, or mail, as well as internet, television and radio advertising claiming to offer relief for consumers saddled with overwhelming debt or homeowners struggling to pay their mortgages.

41.     Only later, if ever, does the consumer discover that there are multiple companies involved in the process. The relationships between the various companies are purposefully obscured to prevent the consumer from disentangling the complicated schemes.

42.     To the extent the Front DRCs reveal that there are multiple companies involved, they falsely represent to the consumer – with Meracord's knowledge and approval – that Meracord is an independent, unbiased "payment processing" company. Meracord itself affirms these misrepresentations and uniformly and falsely holds itself out to consumers as completely "independent" from its Front DRCs and as "objective." In fact, there exist close relationships between Meracord and its network of Front DRCs:

(a)     Meracord promotes, establishes, maintains, and manages debt relief payment servicing accounts on behalf of consumers as an integral component of debt relief programs marketed by its Front DRCs;

(b)     Meracord invites select Front DRCs to join its "VIP Club" and provides these Front DRCs with free industry research and free analyses of their "consumer portfolio[s];"

(c)     Meracord treats major debt relief sales channels to VIP events;

(d)     Meracord provides the software through which customers enrolled by the Front DRCs monitor their escrow accounts and approve creditor settlements – in the relatively rare circumstances that such settlements actually occur;

(e)     Meracord's profits are dependent on increasing the number of debt relief customers signed up by the Front DRCs because each such customer is also *required* to sign-up for Meracord's services;

(f)     Despite Meracord's express representation that the Front DRCs do not act as its "agents," the Front DRCs act under Meracord's direction and control when they provide customers with "Sign-Up Agreements" on its behalf;

(g)     Despite Meracord's express representation that it does not act as an "agent" for its Front DRCs, Meracord in fact processes automatic withdrawals from customer bank accounts and distributes unlawful fees back to the Front DRCs – all supposedly pursuant to dubious "agreements" between the Front DRCs and customers and, upon information and belief, according to express agreements between Meracord and the Front DRCs;

(h)     Meracord is deeply intertwined with the Front DRCs. Meracord's CEO, Linda Remsberg, often attends debt relief industry events on behalf of Meracord, where she serves on panels alongside representatives of the Front DRCs, and, upon information and belief, describes Meracord and the Front DRCs as engaged in the joint endeavor of recruiting debt relief customers.

(i)     For example, in April 2011, Remsberg attended a conference of The Association of Settlement Companies ("TASC," which shortly thereafter changed its name to the American Fair Credit Council). At the TASC conference, Remsberg served on a panel with four other panelists – all four of whom represented Front DRCs. One of the panelists was Andrew Housser, CEO of Freedom Debt Relief, a Front DRC which at the time had already been investigated by the Washington State Attorney General's office for violations of Washington consumer protection laws.

(ii)    During the panel discussion at the TASC conference, on information and belief, Remsberg referred to her company and the Front DRCs as part of a joint endeavor, saying that "[our customers] feel *we* are better at negotiating than they are. That's why they sign up with *us*," and advising that business success for the endeavor depends on "who *we* are enrolling" and "how fast are *we* delivering results." (Emphasis added.)

43.     The standardized contracts provided to consumers by the Front DRCs contain, at the very least, an agreement for debt relief services as well as a Meracord "Sign-Up Agreement," and often contain a myriad of other confusingly worded forms.

44.     The debt relief programs provided for by these agreements universally involve the following material elements:

(a)     The consumer agrees to pay specified debt relief fees that, unbeknownst to the consumer, are illegal and *per se* unfair, but generate large profits for the Meracord Enterprise;

(b)     In addition to the debt relief fees, Meracord charges the consumer unlawful fees to maintain and manage the trust account necessary for the operation of the debt relief program;

(c)     The trust account is established for the purported purpose of accumulating funds with which to pay creditors after the Front DRCs have ostensibly negotiated more favorable terms on behalf of the consumer;

(d)     Meracord is authorized to automatically transfer periodic (usually monthly) payments from the consumer's personal bank account into the trust account;

(e)     The program's success and the consumer's ability to financially afford the monthly debt relief program payments generally presupposes that the consumer makes payments into the trust account *instead* of paying creditors directly, resulting in the consumer falling further and further behind on his or her debt payments;

(f)     Meracord is also authorized to automatically and periodically debit the trust account to pay the exorbitant debt relief fees specified in the debt relief agreement and "Sign-Up Agreement;"

(g)     The fees usually entirely consume consumers' monthly payments for the first months of participation in the program;

(h)     In almost all cases, the consumer would be far better off simply directing the monthly payments to his/her creditors directly, thereby saving the fees illegally, unfairly and deceptively extracted by the Meracord Enterprise, preventing the further accumulation of compounded interest, and preventing or delaying further default on the debt.

45.     The contracts used by the Front DRCs, in addition to charging illegal fees, contain false, misleading, and illegal statements. For example, the contracts, along with the claims made by the Front DRCs' salespeople, often

(a)     Mislead customers into thinking that the debt relief process will be handled by attorneys, or that the Front DRCs are "backed by" law firms;

(b)     Fail to disclose with appropriate specificity the nature of the fees to be charged and when such fees will be incurred;

(c)     Make false and/or misleading claims about the "success rates" of the programs;

(d)     Make false and/or misleading statements about the length of time it will take to complete the program;

(e)     Make false or misleading promises about the percentage of the customer's debt that the company will be able to settle, the amount by which the customer's monthly payment will be reduced, or the extent to which the terms of the customer's loan will be modified;

(f)     Make false or misleading statements about the factors that affect the customer's credit score and the impact of the debt relief program on that score;

(g)     Make false or misleading statements that claim or suggest that the Front DRC is affiliated with nonprofit or government agencies or programs intended to help consumers, or that the Front DRC is affiliated with the customer's creditors; and

(h)     Fail to make legally required disclosures regarding the debt relief services to be provided.

46.     Moreover, the Front DRCs' salespeople often pressure consumers into signing (or "e-signing") the contracts quickly, without any meaningful opportunity to review the terms; and for their part, the contract terms are often so confusingly worded as to be unintelligible to the average consumer.

47.     Meracord knows that the contracts used by its Front DRCs are fraudulent and illegal, but still continues to process payments according to the terms of those contracts. Meracord's knowledge is self-evident, as

(a)     Meracord processes payments pursuant to the contracts used by its Front DRCs, giving it direct knowledge of the fraudulent and illegal nature of those contracts;

(b)     Meracord has produced copies of the contracts in prior litigation, demonstrating that it has the unlawful contracts in its possession;

(c)   Meracord is acutely aware of the enormous volume of consumer complaints regarding these fraudulent contracts and the false claims made to enroll consumers in debt relief programs offered by the Meracord Enterprise. There are scores, if not hundreds, of consumer complaints on the Internet involving the scheme perpetrated by the Meracord Enterprise; and

(d)   Meracord's debt relief "payment processing" business is characterized by astronomically high churn rates (canceled accounts as a percentage of active accounts). Meracord has internally determined that its churn rates invariably exceed 60% and on occasion have exceeded 70% – rates which are symptomatic of and thus reveal widespread fraud;

(e)   Meracord is aware of regulatory enforcement actions against Front DRCs with whom it does business and, in at least some cases, it has unlawfully facilitated the transfer of accounts from Front DRCs under investigation to new or other Front DRCs under common control in order to evade regulatory action.

48.   Front DRCs often tout their association with Meracord as proof of their bona fides and to convince consumers that they are legitimate providers of debt relief services.

49.   The following are just a few examples of the complaints that consumers have posted on the Internet:[1]

(a)   "I am in a terrible debt situation, I used [Meracord] to help me get my debt collection off my back giving them $240.00 a month, now my situation has grown worst, and have paid them $480.00 I can't keep my payments up with [Meracord], I never got any thing done from them and I asked for a refund and they said no, I felt like all my money went into helping my self get out of debt and now they have made it impossible for me to pay anybody now I am in a rut. Why can't I get some of it back, not even $5.00 and they no longer want to help me. I just know that my creditors are still calling and I don't know what to do."

(b)   "[Meracord] is doing business with Lloyd Ward Law Firm. Lloyd Ward Law Firm was supposed to settle my debt and 2 months have gone by and they have not settled any debts. Therefore, they breached their contract. [Meracord] does business with them (I believe they are run by the same person/people. They say they are an "independent"

---

[1]   The complaints are reproduced verbatim, including grammatical and spelling errors.

company). They made 2 deductions from my account and refuses to give the money back stating fees for services by Lloyd Ward. They didn't do anything for me as contracted. Yet, [Meracord] is refusing to refund the money. How independent is that? Just because you have a separate Federal ID number, doesn't mean you aren't owned by the same people. However, I will be filing complaints against both companies. DO NOT DO ANY BUSINESS WITH LLOYD WARD LAW FIRM OR [MERACORD]. THERE IS DISHONESTY BY BOTH. RESEARCH THEM ON THE NET. YOU FIND THERE ARE THE SAME TYPES OF COMPLAINTS AGAINST BOTH."

   (c) "I went to [Meracord] for help on lowering interest on credit cards and they started taking money out of my account every month in the amount of $376.38 and referred me to another company named attorney at law associates Lloyd ward firm for help on the credit cards. The Lloyd ward customers services employees don't want to get in touch with the creditors over the phones, their way is over the mailing letters instead and not talking for the clients and keep taking my money of $376.38. I joined them in March the [Meracord] and the Lloyd wards for help. The account collected from me about three grand already and I just closed it on October 27, 2010 because the Lloyd wards and [Meracord] were taking my money and not helping us. . . . I tried to file a complaint online with the better business bureau and they want so much information, the money was being debit monthly out of my account. Why do I have to prove how crooked these companies are."

   (d) "This Company is a big Scam and I think a class action law suite should be started even if it take years to finish. I encouraged my mother and mother-in-law to enroll and place my name as a contact to assist with both accounts. Me and my wife were providing financial support with the accounts, which my mother-in-law suddenly died last month and the company has had us fax documents as proof. We have sent death certificate, and power of attorney, but the company request q new document everytime because they don't want to release the money that's sitting in the trust account. Since the company appears to be a scam, I had my mother to cancel her account and all they refunded was

$600 and paid off 1 debt in over a year after I provided a $216 payment to her for lloydward/[Meracord] every month. The second debt they claim to be paying an arrangement with has yet to receive the two $184 payments they claim to have paid. After all this, we didn't discover the lies until my wife contacted them that her mother died and requested the funds that were in the trust account. Currently we are seeking an attorney to persue the lloydward firm for the mental anquish they are creating for my wife. At this point it's not the small amount of money, but it's the principal that they are scamming many people including the disabled elderly."

(e)     "Three years ago, I contracted the services of Clear Debt Solution to negotiate and reduce my credit card debt. Per the agreement, I made monthly payments to a third-party account for use in the debt settlement. Over $3000 was collected up front by CDS and [Meracord] Service Center, the party in control of my account. At the end of the program, for which I had contributed $317 per month for over two years, only one account was settled by CDS. When a second creditor sued, CDS did not respond to my requests for information in a timely manner. After I lost the suit, my account was wiped out, plus I had to pay more, to pay the court-ordered settlement. Three accounts remained unsettled. As I had made no payments nor attempts to communicate with the credit card companies, per my agreement with CDS, each balance had doubled over the two years. As I see it, these people made $3000 and I became deeper in debt than when I started."

(f)     "Lifeguard Financial is a fraud. They make claims that they can settle your debt for 50 cents on the dollar of your debt. They claim that they negotiate your debt with your creditors, a lie. The client does all the work contacting the creditors that Lifeguard is handling the clients debt. Lifeguard takes monthly payments from your checking account through a escrow agent, namely [Meracord]. The problem is most of all of your payments through [Meracord] go back to Lifeguard Financial as fees leaving little funds to accumulate to go towards the settlement with the creditors. I was in this program almost a year and found that little amount of my monthly payments were accumulating towards

settlement. In another instance, I was threated with a lawsuit from one of my creditors, I was told by their legal department to respond to the court clerk sending me notice of the potential lawsuit which I also had to copy to the plaintiffs' attorneys.  Lifeguard is of no help.  In addition the creditors explained to me that they refuse to deal with Lifeguard Financial. So what does that tell you. I will file a complaint with Florida's attorney general. I don't think that contacting BBB will get anywhere. I cancelled my contract with Lifeguard Financial and expected a cordial conversation and that they will refund of my monies that I paid them. Instead I got this "pitbull" whose name is "Robert" on the telephone that started screaming at me about cancelling the contract with threats of suing me. I ended up screaming back at him, needless to say at this point I out several thousand dollars. If there is a class action suit, I want to be part of it."

(g)    "Back in March of 2008 I entered into a contract for debt relief with ClearDebt Results. I first spoke with a Robert Till, then a Patrick Schlosser, then I was passed to James Callahan, then again to Tiffany Shrum, all who appear to no longer work at this company. This company has taken $1300 dollars from me, provided no service as they say they were going to and they have a company called [Meracord] Service Center continue to take $100 a month directly out of my check. I want answers as to why they aren't taking care of these credit issues as they stated they would. None of these creditors have been paid and I continue to get harrassing phone calls."

(h)    "On 09/16/09, I signed a contract with Covenant Debt Solutions to have them settle my unsecured debt and credit card accounts. Covenant used the services of [Meracord] Service Center to deduct monies from my checking account to payoff my debt. [Meracord] began to deduct $535.74 on the 17th of each month, beginning on 10/17/2009. The monthly deduction included $390.93 for service fee, $14.50 for maintenance fee and $130.31 to be placed in my trust account. It was very difficult to speak to Covenant's customer service department and I decided to cancel their services on 11/30/09. I spoke with "oscar" who stated my trust account funds would be mailed to me within 7-10 days

1    and pursuant a phone call from Brian. I waited but no check was sent to me. I phoned Brian

2    who stated that he was not in charge of approving issuance of any checks and that he would

3    have a supervisor contact me. I never received a phone call from a Covenant supervisor. To

4    this date, no check has been issued/received from Covenant or [Meracord]. I placed a stop

5    payment with my bank to prevent [Meracord] to continue taking my monies."

6         (i)    "I was contacted by 1st. United Consultant about lowering my mortgage

7    payment each month. They told me that they could get it down to $622.11 a month. I would

8    set up payments to Meracord and they would have an agreement with the company that I

9    pay my mortgage to and could get it lower. Like a idiot I did but when I got a statement

10    from my mortgage company saying they did not recieve my payment for Sept. I knew I was

11    in trouble. I tried to contact Lee Arthur at 1st United by fax, phone and email could not

12    reach him he did not return email back to me. I was told I could cancel any time and get my

13    money back all I had to do was send a letter. No address for them so I faxed none of the

14    faxes would go through. I contacted Meracord by email got a repley back no problem my

15    account is closed and any money that they have that doesn't go to the service provider

16    would be returned to me within 24 hrs after the Oct. 24th. That came and went, I contacted

17    them again I got a message back saying account is closed and 0 money to be returned. So I

18    called I talked to some one there that told me my account is closed and they no longer do

19    business with 1st United because of the way they conduct business, so longer wanted to be

20    associated with them. That they sent my money to 1United since they were the ones that

21    hired them. Supposed to be for fees or something which is a lie they never paid my Sept.

22    payment so now I am behind and could lose my home. Lee Arthur is a thief and a liar. I also

23    believe Meracord still is associated with them."

24         (j)    "Meracord united consultant all that work here rip me off 2380.00 setting up

25    fake companies and collecting money Internet. Meracord is not licensed in the State of

26    Maine. Check better busness . The att gerneral is working on mine. I am loosing my home

27    because of them. All I asked was for mine money back. Now its personal now. I am going

28

CLASS ACTION COMPLAINT
AND JURY DEMAND                           - 18-
010262-15 603905 V1

1   to the media with my story and proof I kept all my paperwork and my bank statements. I

2   have hired an attoney I am going to sue for the house. It was put several disabled people

3   home less and penniless. If this is a company that you put your money in you need help

4   They haven't even responded to the paperwork that was sent to them from the Attorney

5   General Office. They knew United Consultant was a fake company. They check them out

6   before they agree to collect money for them. If this has happened to you go to your att

7   general and go to the media."

8          (k)     "suray of United consultation was my contact person. suray sent me

9   paperwork to mod my home, I wasn't behind but had high % rate. My mom had to move

10  because of medical reasons so I was paying out all the income but 100 dollars, so surray

11  was going to mod my mortgage to make it more comfortable and affordable. Meracod took

12  over 2000 out of my account I thought it was going to my mortgage. Until they called me

13  and we talked. MERACORD is also fake they just take your money, AND DO NOTHING.

14  but help you loose your house. we are losing our home and I have gone to the media for

15  help no else seems to really care, Meracod didn't stop practices with united Consultant

16  until everyone started complaining. Don't they check their companies they work

17  for!!!!!!!!!!!!!!!!!!!! anyone dealing with these companies BEWARE their not what they

18  seem. All I wanted was my money back now its personal. They won't even talk to me."

19          50.     Instead of investigating these complaints and returning the money wrongfully taken

20  from consumers, Meracord devotes its energy to posting false and misleading rebuttals to these

21  complaints. These rebuttals falsely claim:

22          (a)     That Meracord "takes on the payment servicing obligations as an

23  independent and objective company and does not act at the direction of the [debt relief

24  companies]," despite the fact that Meracord withdraws fees from customer payments *at the

25  behest of* its Front DRCs and then provides those fees to the Front DRCs;

26

27

28

(b)     That it is "not contracted with" its Front DRCs, despite the fact that, on information and belief, Meracord and its Front DRCs enter into contracts related to the debt relief programs administered by both entities;

(c)     That it "follows the instructions stated in the Meracord contract and at no time acts without authorization from the consumer," despite the facts that (1) many times the contracts signed by consumers do not contain clear or specific schedules of when fees will be withdrawn, and thus Meracord's withdrawal of fees must necessarily be the result of separate (unilateral) instructions from the Front DRCs; and (2) Meracord facilitates the transfer of consumers' trust accounts from one Front DRC to another without authorization from those consumers.

51.     Meracord perpetuates the fraud by making false and misleading statements of its own through its website, emails and letters to customers, and the Sign-Up Agreements given to customers on behalf of Meracord by the Front DRCs. These statements include false assurances that customers are fully "in control" of their accounts, and that Meracord will not disburse any funds without the customer's permission, when in fact Meracord and its Front DRCs are in control of the debt settlement accounts, routinely disbursing money to themselves for unearned and illegal fees.

52.     Customers who discover the fraudulent activities of the Meracord Enterprise find themselves fighting an uphill battle to disentangle the labyrinthine scheme and determine the party ultimately responsible for the scam. The ephemeral Front DRCs disappear, stop answering phone calls, disclaim responsibility, or resort to outright threats and intimidation; and Meracord also refuses to admit any responsibility for the fraud in which it was complicit. Indebted consumers are thus left in *worse* positions than if they had never sought help at all, having often paid thousands of dollars in exorbitant and illegal fees that could have gone towards paying their debts.

53.     Meracord profits from the fees generated by each consumer enrolled by the Front DRC members of the Enterprise, knowing that the fees are generated by fraudulent and deceptive means, and knowing that often the fees charged are flatly illegal.

54.     The Front DRCs in the Meracord Enterprise include entities such as:

(a)     Texas attorney Lloyd Ward and his various business entities (collectively, "Lloyd Ward"), whose debt settlement business has been the subject of multiple lawsuits and government investigations, including (1) a lawsuit by a Kansas consumer who was awarded $100,000 in damages against Ward for violation of Kansas consumer protection statutes; (2) an investigation by the Connecticut Department of Banking that resulted in a $500,000 civil penalty for violations of that state's statutory requirements for debt adjusters; and (3) an ongoing disciplinary petition filed by the Texas Commission for Lawyer Discipline, alleging six separate violations of the Texas Disciplinary Rules of Professional Conduct.

(b)     Freedom Debt Relief, which has had 251 complaints filed with the Better Business Bureau in the last three years and been the subject of an investigation by the Washington Attorney General which resulted in a March 3, 2011 consent decree. As a part of the consent decree, Freedom Debt Relief agreed to pay approximately $800,000 in restitution for Washington consumers, and was forbidden from contracting with new Washington customers without notifying the Attorney General's office.

(c)     1st United and New Life Financial Solutions – the two companies involved in victimizing Plaintiffs Donte Cheeks and Richard Pierce – along with other associated companies, which were the subject of a suit by the Federal Trade Commission alleging twelve counts of violations of federal law stemming from the companies' deceptive practices. The complaint alleges:

> Defendants dupe distressed consumers into paying thousands of dollars based on false promises and misrepresentations. Defendants mislead consumers into thinking that their services come at little or no cost, and that consumers' payments will be held in escrow pending resolution of debt settlement agreements with their creditors. In reality, much, if not all, of these payments are taken by Defendants up-front, as their undisclosed fee. In the end, Defendants provide little, if any, meaningful assistance to resolve consumers' debt, and consumers are left worse off after signing up- and paying- for Defendants' services.

55.     The Front DRCs in the Meracord Enterprise profit from the fees generated by fraudulently inducing consumers to sign up for their debt relief "services," and profit from their association with the Meracord Enterprise by using Meracord to legitimize their services and by convincing consumers that their money will be safe in a Meracord account which only the consumer can control. In addition, because Meracord usually automatically deducts payments from the consumer's bank account, the Front DRCs are more likely to reap illicit gains from consumers automatically after signing them up, as opposed to a system in which consumers would later – after having reviewed and contemplated the "services" being offered – have to make a separate payment.

56.     In order to thwart regulatory actions, evade detection, and continue to victimize financially distressed consumers, the Front DRCs that are members of the Meracord Enterprise regularly enter into agreements between and among themselves to transfer "portfolios" of victims. For example, in late 2010, Front DRC "The Debt Answer" faced numerous complaints and regulatory issues, including an investigation by the Connecticut Department of Banking. Instead of complying with the law, The Debt Answer sold its portfolio of 3,407 "active" debt settlement victims' accounts to Front DRC Lloyd Ward on January 1, 2011. The Debt Answer itself had apparently earlier purchased an undisclosed number of these victims' accounts from another Front DRC, Simon & Bocksch.

57.     On information and belief, Meracord facilitates these fraudulent "portfolio" transfers by wiring the unlawful fees to the new entity without any authorization from the consumer account holders, who generally remain unaware that their accounts have been transferred. In fact, on at least several occasions, Meracord account representatives have recommended such transfers upon learning that a Front DRC has encountered legal issues and "is going to be closing the doors." By facilitating – and in some cases recommending – these wholly fraudulent transfers of "portfolios" of victims' accounts, Meracord ensures that its steady flow of unlawful fees continues.

58.     Attorney-run Front DRCs have a special role in the Meracord Enterprise. By marketing themselves as law firms, they are perceived by consumers as more trustworthy and as

1    more competent negotiators. Moreover, non-attorney Front DRC's often affiliate with an attorney-

2    run Front DRC in an attempt to evade regulations in states that prohibit debt settlement, which

3    often have exceptions for practicing attorneys. Thus, by spuriously affiliating itself with a law firm,

4    a non-attorney Front DRC may extend the period during which it can avoid regulatory scrutiny.

5         59.    Front DRCs also coordinate and communicate directly with each other through the

6    formation of industry trade associations whose primary purpose is to spread misleading

7    information about the debt relief industry and issue bogus "certifications" to Front DRCs. Front

8    DRCs then use these bogus certifications to convince consumers that their activities are legitimate.

9    The following is an actual Frequently Asked Question (FAQ) from the website of one of these

10   bogus trade associations, the United States Organizations for Bankruptcy Alternatives, Inc.:

11          Why do the Debt Settlement Companies I am researching seem to all
            have failing grades with the Better Business Bureau (BBB)?
12

13          In an unfortunate turn of events, the BBB recently implemented a
            new 'scoring model'. This scoring model dictates that certain
14          industries be graded as a whole. Unfortunately in the case of debt
            settlement companies, this model is quite severe, and has any
15          company, regardless of their best-practices operations or good track
            record, restricted from achieving any rating above C-, USOBA
16          supports the theory behind the BBB; a consumer should have a
            resource to compare companies in any industry based on the
17          company's merits alone. At this time, the BBB ratings of Debt
            Settlement companies tells a consumer little or nothing about a
18          company's ethics or reputability. Several USOBA members and
            other Debt Settlement entities were asked to "give back" prestigious
19          awards and achievements such as the BBB Accreditation and BBB
            Torch Award. Prior to the scoring model change, the companies were
20          exemplary in the eyes of the BBB. If you wish to include the BBB in
            your research of a Debt Settlement provider, we suggest you look
21          carefully at the complaint resolution and not the arbitrary score.

22        60.    As the above allegations make clear, the Front DRCs that are part of the Meracord

23   Enterprise are directly connected to each other through bogus trade associations as well as the

24   formal and informal agreements described above. Thus, the Meracord Enterprise involves

25   relationships between Meracord and the individual Front DRCs as well as relationships between

26   and among the Front DRCs themselves – all evidenced by both the participation of Meracord

27

28

Enterprise members in industry-wide events and trade associations, as well as the formal and informal agreements made among those members.

61. The Meracord conspiracy is a classic hub-and-spoke conspiracy which also involves relationships between the various spokes. Meracord serves as the hub of the Meracord Enterprise, entering into bilateral relationships with each Front DRC through which Meracord both directly engages in and facilitates the fraudulent and illegal activity of the Meracord Enterprise, as alleged herein. As discussed above, Meracord also causes and assists the various "spokes" – the Front DRCs – in communicating with and conspiring with each other, all for the common benefit of the Meracord Enterprise and to the common detriment of its victims, whose accounts are involuntarily shifted from one dubious Front DRC to another, with Meracord's indispensable assistance, in order to hinder regulatory protective actions. These relationships between Front DRCs, many of which are facilitated by Meracord, benefit and advance the Meracord Enterprise as a whole. Other relationships between the Front DRCs include their bogus trade associations and countless conspiratorial interactions between such Front DRCs at various debt relief industry functions, including those attended and sponsored by Meracord.

## C. Injury to Plaintiffs and the Class

62. The experiences of Plaintiffs are illustrative of the Meracord Enterprise's use of unscrupulous Front DRCs to recruit consumers for its fraudulent and unlawful debt relief services.

63. Plaintiffs were struggling to make payments on their debts, including student loans, mortgages, and credit cards. The Front DRCs recruited Plaintiffs by promising that they could renegotiate Plaintiffs' debts quickly and substantially reduce the amounts owed on those debts. After Plaintiffs signed up with the Front DRCs, Meracord withdrew regular periodic (usually monthly) payments from Plaintiffs' bank accounts. After many months in their respective debt relief programs, none of the Plaintiffs had received the services promised – and one Plaintiff had been sued by multiple creditors and had at least one default judgment entered against her due to her reliance on the Front DRC's false representations that it would act as her attorney. In response to

1    Plaintiffs' inquires, the Front DRCs either disappeared completely or offered little if any

2    information about the status of their "negotiation" efforts.

3         64.    With knowledge of the fraudulent nature of the contracts between Plaintiffs and the

4    Front DRCs, Meracord withdrew periodic payments from Plaintiffs' bank accounts and deducted

5    exorbitant, illegal, and unearned fees, and failed to return those fees after Plaintiffs closed their

6    accounts.

7    **D.     Donte Cheeks**

8         65.    Plaintiff Donte Cheeks is a resident of Washington D.C. In early 2011, he was

9    struggling to pay a small credit card debt – approximately $800 – and a $7,000 student loan that he

10   had incurred while attending a truck driving school in Louisiana. Donte had been forced to quit the

11   school because it was too far from his mother, who lives in D.C., is disabled, and substantially

12   relies on Donte for financial support.

13        66.    Donte was being hounded by a debt collection agency about the student loan when

14   he finally decided to look online for help, where he entered his contact information into a website

15   claiming it could help consumers reduce their debts by negotiating with their creditors.

16        67.    Sometime in March 2011, Donte received a call from a salesperson working for a

17   company called New Life Financial ("NLF"). The salesperson assured Donte that NLF could settle

18   his debts – including his student loan debt – for half of what he owed. Even with the lower amount,

19   however, Donte could not afford the monthly payment quoted by the salesperson, so he asked the

20   salesperson to call back later.

21        68.    At most a few days after the first call, the salesperson called back and pressured

22   Donte to sign up with NLF. The salesperson promised Donte that his debts would be drastically

23   reduced, and at one point also told Donte that NLF could increase his credit score to 850. The

24   salesperson referred, throughout the conversation, to God and to religious faith. Lured by the

25   promises and comforted by the perception that the salesperson shared his religious convictions,

26   Donte agreed to enroll his delinquent student loan account in NLF's debt settlement services.

27

28

69.     The NLF salesperson sent Donte a set of documents by email and pressured Donte to sign right away. While on speakerphone with the salesperson, Donte opened the email on his smartphone and scrolled through the documentation. The salesperson made Donte feel as if it was "now or never," and as if Donte needed to sign up as quickly as possible to alleviate his debt-related stress. The salesperson clearly had experience rushing customers through the signing process on their phones, telling Donte that he could use his fingernail to "sign" the documentation through his smartphone.

70.     At no time did the salesperson explain to Donte the details of the documents that he was asking Donte to sign; nor did he mention any fees that Donte would be charged.

71.     Relying on the NLF salesperson's promise to halve his debts, Donte electronically signed the NLF documents, which included an Agreement for Services ("NLF Agreement"), a "Debt Appraisal Guide," and a Sign-Up Agreement with Meracord.

72.     Although the NLF Agreement mentions debt settlement, the nature and structure of the "services" described by the Agreement are so vaguely worded as to be nearly incomprehensible, with the Agreement making amorphous promises such as that NLF will:

  (a) "provide you with the necessary guidance to restructure your financial picture;"

  (b) "provide financial consultation which in turn will create a detailed financial appraisal which will place you in the most beneficial position to qualify for either debt settlement, loan modification, a mortgage short sale, tax debt settlement, lien strips, etc. as well as providing you the tools necessary to better manage your finances in the future;" and

  (c) "provide its best efforts to produce a clear picture of your financial situation and on the debts you owe to your creditors listed in the documents you submit."

73.     The NLF Agreement lists nine monthly payments of $418.98. The NLF representative had told Donte that those payments would be used to pay off his debts, and nowhere does the NLF Agreement itself explain what proportion of the monthly payments will be paid to NLF in fees as opposed to going to pay his creditors.

74.     Between April and December 2011, Meracord withdrew all nine payments, totaling $3,770.82, from Donte's bank account.

75.     During this time, Donte continued to receive calls from the debt collection agency seeking payment on his student loan. Confused by these calls, since he believed that NLF had already taken care of the debt, Donte called NLF to check on the status of the settlement. NLF told him they had never received any information regarding the student loan debt collector, despite the fact that the student loan account was the only one Donte originally enrolled in the program.

76.     After that first call, Donte assumed he had rectified any problems, but he continued to receive harassing phone calls from the student loan collection agency. Donte told the collection agency that NLF was handling the debts, but the agency said that it had heard nothing from NLF.

77.     When Donte had made his final payment to NLF and Meracord and realized that nothing had been done to fulfill the promises to help cut his debt in half, he once again called NLF. It was only at this point – nine months after Donte first signed up with NLF – that an NLF representative told Donte that he did not "qualify" for the "program" because he did not have at least $10,000 in debt.

78.     Never had the NLF salesperson mentioned anything about the need to "qualify" for the program, nor did the NLF Agreement describe any process by which NLF would evaluate Donte to determine if he was "qualified." More importantly, however, Meracord had withdrawn $3,770.82 from his bank account, and Donte had received nothing in return.

79.     Donte asked to speak to a manager, but was told that the manager was unavailable. He called back several times over the course of several days only to be told again and again either that the manager wasn't available or wasn't in the office.

80.     When he finally was allowed to speak with a manager, the manager reiterated that Donte did not qualify for the debt settlement program, at which point Donte requested that NLF return the $3,770.82 Meracord had withdrawn from his bank account. The manager then told Donte that not only did he not qualify for the program, but he didn't "qualify" for a refund. The manager explained that Donte could not get a refund because he had already received NLF's "Debt

1   Appraisal Guide," a 60-page document sent to Donte along with other NLF documentation, and

2   which contained generalized information and "tips" about financial and debt management for

3   consumers.

4        81.    In other words, the NLF manager suggested that this generic 60-page document

5   constituted "financial advice" worth over $3,700.

6        82.    Since he did not have the money to hire a private attorney, Donte sought help from

7   the Legal Aid Society of D.C. The attorney assisting him wrote a letter to NLF demanding the

8   return of the $3,770.82 that Donte had paid, but NLF never responded. Neither NLF nor Meracord

9   has returned any of the money as of the date of this Complaint, and Donte continues to be unable to

10   pay his (interest-accruing) debts and receives frequent collection calls as a result.

11   **E.**    **Deborah Horton**

12        83.    Plaintiff Deborah Horton resides in Pearcy, Arkansas, where she moved in 2009,

13   after the death of her father, in order to be closer to and to help care for her elderly mother. At that

14   time, she was working as a medical transcriptionist, and was able to purchase a home in Pearcy.

15        84.    In 2010, after being laid off, Deborah was forced to file bankruptcy. She managed to

16   keep the home, but by May 2012, having recently had major back surgery and having lost her job

17   once again, Deborah was struggling to make her mortgage payments to Wells Fargo.

18        85.    It was at this point – one of her lowest points physically, mentally, and financially –

19   that Deborah received an unsolicited phone call from two men, Chris Chapman and Greg Gordon,

20   who told Deborah that they could reduce her monthly mortgage payment from $824 to $674.

21   Deborah asked Gordon and Chapman how that was possible, to which the two replied that they had

22   "thousands" of customers, and the number of loans they dealt with gave them more bargaining

23   power with the bank.

24        86.    The two men said they "worked with Meracord and Wells Fargo," and mentioned

25   no other company's name. Because Chapman and Gordon knew many specific details about her

26   mortgage – including her interest rate, payment amount, and the fact that Wells Fargo had

27

28

1   previously denied her requests for a loan modification – Deborah believed that they were

2   legitimately working with Wells Fargo.

3       87.     Moreover, before signing up with Gordon and Chapman, Deborah asked a lawyer

4   his opinion on Meracord. When the lawyer reported that he had looked up Meracord online and not

5   found anything negative, Deborah was satisfied that Meracord was a reputable business. Only later

6   did Deborah learn that the company had recently changed its name, and had only been operating

7   under the name Meracord for a few months before Gordon and Chapman contacted her.

8       88.     Having alleviated some of her skepticism, Deborah decided to sign up with Gordon

9   and Chapman to get her mortgage modified. When she signed up, the two men told her to stop

10  making her monthly $824 payment to Wells Fargo, and instead to make four payments of $674 to

11  Meracord. During that time, they claimed, they would negotiate with Wells Fargo to lower her

12  monthly payment to $674, and then would forward her payments to Wells Fargo on her behalf.

13  After four months, Deborah would resume making monthly payments directly to Wells Fargo, at

14  the new lower amount of $674.

15      89.     In May 2012, Gordon sent Deborah what she thought was a very professional-

16  looking contract over the internet, and directed her to a choice of four electronic "signatures,"

17  asking her to choose the one which looked most like her actual signature. When Deborah attempted

18  to read through the contract, Gordon tried to dissuade her, telling her that he had already essentially

19  told her what it said, and that she wouldn't understand it anyway, since it was all written in

20  "legalese." Deborah was convinced of that when she attempted to read the first page of the contract

21  and couldn't understand what it said, so she did not attempt to read the rest. She chose one of the

22  four electronic signatures, and Gordon inserted the signature in the contract and subsequently

23  emailed her a "signed" copy.

24      90.     Chapman and Gordon also sent Deborah a packet of documents to send to Wells

25  Fargo, instructing her not to open the packet but to address it to Wells Fargo as if it came from her.

26  Deborah did as she was told, and still does not know what was contained in those documents.

27  Chapman and Gordon also instructed Deborah not to talk to Wells Fargo directly.

28

CLASS ACTION COMPLAINT
AND JURY DEMAND                          - 29-
010262-15 603905 V1

1      91.    Based on what Chapman and Gordon had told her, Deborah believed that the

2  monthly payments she was making were being sent to Wells Fargo, but in July 2012, after making

3  two monthly payments to Meracord, Deborah realized that the payments were not reflected on her

4  mortgage statement. Deborah contacted Wells Fargo, which said that it had never heard of

5  Meracord, Chapman, or Gordon.

6      92.    When Deborah confronted Chapman and Gordon over the phone, they became very

7  upset with her for contacting Wells Fargo, telling her that if she talked to the bank directly she

8  would "mess up" the deal they were making for her loan modification.

9      93.    In August 2012, Wells Fargo responded to the package Deborah sent at the direction

10  of Chapman and Gordon. Wells Fargo sent Deborah two letters. The first letter stated that it

11  "received documentation from you requesting mortgage payment assistance" and "needed to speak

12  with [her] right away to determine what options might be available to you." The second letter

13  stated that Wells Fargo was reviewing Deborah's loan documents and enclosed those documents

14  for her review. The letter also stated that "Per your instructions, we have taken the necessary steps

15  to cease all telephone calls." Deborah did not make this request but did not know what was in the

16  package that Chapman and Gordon instructed her to send.

17      94.    When Deborah told Chapman and Gordon that Wells Fargo wanted to talk to her

18  about modifying her loan, they told her again not to talk to Wells Fargo, and instead to send

19  everything Wells Fargo sent her to them. Deborah emailed Chapman and Gordon copies of the

20  letters and documents.

21      95.    On September 20, 2012, Deborah received a letter from Wells Fargo saying that her

22  mortgage was in default. Deborah began to worry that something was wrong and that Chapman and

23  Gordon were not helping her. She immediately sent that letter to Chapman and Gordon, who told

24  her not to worry about the letter because they were working with Wells Fargo and that the

25  payments she was making would be reflected on her mortgage statement in October.

96.    Under the agreement with Chapman and Gordon, Deborah was to start making her lower monthly payment directly to Wells Fargo on October 15, but by early October, she had not heard from either man.

97.    Beginning on October 11, she tried to contact them without success. In several emails between October 14 to 25, 2012, Deborah begged Chapman and Gordon to call and update her on the status of the loan modification. She told them that she was stressed and worried about being thrown out of her home. She never heard from the two men again.

98.    On or about October 26, Deborah started researching Chapman and Gordon online and found numerous complaints against the two men and Meracord. She also called Meracord, whose representative told her that the company had nothing to do with Chapman and Gordon.

99.    By the time Deborah realized that Chapman and Gordon were not negotiating with Wells Fargo, she had missed five mortgage payments, incurring late fees, and had lost nearly $2,700 in the payments she made to Meracord.

100.    Deborah reported what happened to the Arkansas Attorney's General Office, but was told that while the office had attempted to contact Meracord, it did not get a response.

101.    Deborah is still struggling to make her mortgage payments. Although she receives some disability benefit payments due to her back problems, she is unable to make the payments without the help of her elderly mother, causing extreme stress for both Deborah and her mother.

**F.    Richard Pierce**

102.    Plaintiff Richard Pierce resides in Brea, California, where he is self-employed in the construction business. The construction industry having been hit particularly hard by the downturn in the economy, Richard's business has dwindled in the last few years. Richard is 74 years old and lives with his wife in a house they have owned for over twenty years. They planned to stay in their home for the rest of their lives, but when Richard's business declined, they began having trouble making their mortgage payments. Although his mortgagor, Bank of America, agreed to reduce his mortgage payment for a limited time, Richard is unable to afford his payments without a permanent modification.

103.    In July 2012, Richard was contacted by Jesse Wiseman, a representative of a company called 1st United Consultants ("1st United"). Wiseman told Richard that 1st United could reduce his mortgage payment from $3,113 to $1,530 per month. As Wiseman described it, 1st United was a "broker" that collected "piles" of mortgages. After these mortgages were collected, they were "bid on" by lawyers, who would use the high number of mortgages to give them leverage in negotiating with the mortgagors.

104.    Wiseman told Richard he would need to make four payments of $2,632 to Meracord to put in a trust account, and then his mortgage would be given to a lawyer. According to Wiseman, having a pool of money from Richard and others borrowers would give the lawyers additional leverage, and would prove to Bank of America that Richard was capable of making the new lower mortgage payment. Wiseman promised Richard that the attorney who negotiated the modification would then reduce his monthly mortgage payment by over 50% (from $3,113 to $1,530), and that then the money Richard had saved in his trust account would go towards those lower monthly payments.

105.    Wiseman also told Richard that while he was making payments to Meracord, he should not make payments to Bank of America, since the bank would not negotiate a mortgage modification unless he was behind in his payments.

106.    Richard was leery of Wiseman, but he wasn't sure how to verify whether Wiseman or 1st United were legitimate. Richard asked to speak to someone else working for Wiseman, whereupon Wiseman connected Richard to a woman Wiseman said was his secretary. In response to questions from Richard, the woman said that she processed approximately ten mortgage modifications per month, and that maybe one out of ten was rejected. Richard took this conversation as a reassuring corroboration of Wiseman's claims that Richard's mortgage could be successfully modified.

107.    Relying on Wiseman's promise to reduce Richard's monthly mortgage payments by almost $500, Richard agreed to sign up for 1st United's mortgage modification services.

108.     On or about July 22, 2012, Wiseman sent Richard documentation that ostensibly represented their agreement – which included a "Client Services Agreement" ("1st United Agreement") along with a Meracord Sign-up Agreement – and Richard electronically signed the documentation on July 23, 2012, within approximately a day of receiving it.

109.     The 1st United Agreement contains very similar language to the NLF Agreement signed by Plaintiff Donte Cheeks. Like the NLF Agreement, the 1st United Agreement mentions the debt relief service Richard believed he was signing up for (a loan modification), but the nature and structure of the "services" described in the Agreement are so vaguely worded as to be nearly incomprehensible. Like the NLF Agreement, the 1st United Agreement makes a variety of amorphous promises such as that 1st United will:

(a)     "provide You with financial consultation services, which in turn will provide education, budgeting tools and exercises and create a detailed financial structure . . . ;"

(b)     "provide you with the necessary guidance to restructure your current financial standing and provide best efforts to obtain a plan using financial products and services to help you achieve your financial goals;" and

(c)     "provide its best efforts to produce a clear picture of your financial situation based on information provided by You."

110.     After signing the documentation sent by Wiseman, Richard received a "Welcome" email from someone at 1st United named Suray Mendez, who attached a document called "Debt Appraisal Guide."

111.     The day after signing the 1st United documentation, July 24, 2012, Richard sent Wiseman a blank check to set up the withdrawals from his account, his last mortgage statement, and a hardship letter explaining his financial difficulties. Richard believed that 1st United and the attorney who ended up handling his case would use the letter in negotiating with Bank of America.

112.     The 1st United Agreement provided for four monthly payments of $2,632 each. From his conversation with Wiseman, Richard understood that after he made those initial four payments, his mortgage payment would then be further reduced to $1,530. The initial payments of $2,632 appeared in a table marked "Schedule A" at the end of the Agreement. That table noted

Richard's "Current Monthly Payment to Creditors" as $3,113. It then listed four "New Payments" of $2,632, and below each "New Payment" the table listed a "Monthly Savings" of $481, suggesting that these "New Payment[s]" would be going towards Richard's mortgage payments.

113.   On August 1, 2012, Meracord withdrew the first payment of $2,632 from Richard's bank account. Sometime after that payment, Wiseman called Richard and told him that 1st United was preparing a big package of mortgages for the attorneys. Although Wiseman had originally told Richard that he would have to make four payments before his mortgage would be handled by an attorney, Wiseman said if Richard could make another payment immediately, his paperwork could go to the attorneys early. Richard told Wiseman he only had approximately $2,000 that he could send, and Wiseman said that was ok.

114.   On August 29, 2012, Richard sent the additional $2,000 to Meracord. He expected to hear from an attorney within a week or two, but he never heard from an attorney, Wiseman, or anyone from 1st United again.

115.   On September 4 and October 1, 2012, Meracord withdrew the next two payments of $2,632 from Richard's bank account.

116.   On October 11, 2012, Richard attempted to contact 1st United, but the phone number was busy all day. The same day, he sent an email to Wiseman inquiring about the status of his loan modification. Wiseman never responded.

117.   Having heard nothing from 1st United, Richard called Meracord. The Meracord representative told Richard that Meracord was no longer doing business with 1st United because 1st United had shut down and was being investigated by the federal government. Of the $9,896 that Meracord had withdrawn from Richard's bank account, Meracord agreed to return only $1,985 to Richard – representing the additional $2,000 payment less a $15 fee – but refused to return the remaining $7,911.

118.   On October 12, 2012, after once again finding 1st United's phone number busy, Richard emailed Wiseman and Mendez, requesting a refund or proof that an attorney was

1  negotiating with Bank of America. Richard sent another request for a refund on October 17, 2012.

2  No one from 1st United ever responded.

3  119.  On February 15, 2013, Richard sent a letter to Meracord requesting a refund of

4  $7,876.50 for the three regular payments that Meracord had withdrawn from his bank account and

5  not returned.

6  120.  On March 22, 2013, Meracord responded by letter from its General Counsel, telling

7  Richard that the entire amount had been disbursed to 1st United and Meracord as fees. Meracord

8  admitted that it was aware that 1st United had entered into a stipulated preliminary injunction as

9  part of a case that the Federal Trade Commission filed against it and other defendants. On March

10  25, 2013, Meracord refunded to Richard $34.50, which it said represented the fees that had gone to

11  Meracord.

12  **G.    Erma Sue Clyatt**

13  121.  Plaintiff Erma Sue Clyatt ("Sue") resides in Florida, where she is retired and lives

14  on a fixed income. She had struggled with overwhelming credit card debt for years and previously

15  attempted debt settlement, but those attempts ended when Sue was unable to make her monthly

16  payments.

17  122.  On January 28, 2013, Sue received an unsolicited phone call from a man named

18  Nicholas Paul. Paul told her that he worked with a "consulting firm" for the Law Offices of Paul A.

19  Herman ("Herman Law Firm"). Paul said that he found Sue's contact information "online" –

20  although Sue didn't remember visiting any website for the Herman Law Firm – and was calling to

21  help her with her debts.

22  123.  At the time of Paul's call, Sue, an asthmatic, was recovering from a lengthy illness

23  that affected her breathing, and was still feeling physically weak and run down.

24  124.  Paul told Sue that if she continued to leave her debts unpaid, her creditors could sue

25  her and take her property, but assured her that the Herman Law Firm could dispute her credit card

26  debt and negotiate with her creditors to lower her debt payments. Paul told her that she would have

27

28

to pay approximately $305 twice per month. From their conversation, Sue understood that those payments would go toward paying off her debt.

125.    The thought of being sued and losing her property frightened Sue, and Paul, a fast-talking and persuasive salesperson, was quick to play on her fears in order to convince Sue to sign up with the Herman Law Firm. Moreover, Paul led Sue to believe that the money she paid to the Herman Law Firm would go toward making the lower monthly debt payments that Paul had convinced her the firm would negotiate on her behalf.

126.    After she agreed to sign up, Paul told her that he would send her the documentation to sign online, and that after she signed the documentation, an attorney would contact her. That never happened.

127.    On January 30, 2013, Sue received a link to the Herman Law Firm documentation and electronically signed it. Still not having fully recovered from her illness, Sue electronically signed the contracts without reading them completely.

128.    Sue signed four documents:

(a)     A Proposed Limited Legal Services Agreement with the Law Offices of Paul A. Herman, P.A. Under the Agreement, the law firm promised to "to validate, dispute, and litigate or arbitrate" Sue's debt. The Agreement provided for a "fee" of $13,500, to be paid in bi-weekly "installments," and provided that "[a]ll monthly payments made to the law firm will be considered non-refundable and paid for services rendered."

(b)     An Installment Note agreeing to pay the Herman Law Firm $13,500 at a 0% interest rate by installment payments twice a month of $305.74 and $305.75. Paul had caused Sue to believe this money would go toward paying off her debt, and the Installment Note itself said nothing about where the payments would go, but only said the payments were "for value received" – although in fact Sue had received nothing whatsoever of value from the Firm.

(c)     Meracord's Sign-Up Agreement, which lists "Esquire Litigation Support" – not the Herman Law Firm – as Sue's "service provider."

(d)     A Referral Disclosure Statement, which stated that the fees collected by the law firm would not be used for debt settlement. That statement was directly contrary to what Paul told Sue about her payments, which was that her payments would be used to settle and pay her debts.

1    129.    When Sue signed the agreements, she owed approximately $45,500 in credit card

2    debt.

3    130.    Between February 11 and March 6, 2013, Meracord withdrew three payments

4    totaling $917.23 from Sue's bank account. When she was unable to make the second payment due

5    in March, Sue called the Herman Law Firm. She spoke to a paralegal who told her that her

6    payments were going toward a retainer and would not be used to pay her debts.

7    131.    This call was the first time that Sue had heard anything about her payments going

8    towards fees rather than paying her creditors, and she was extremely concerned about having been

9    mislead. Feeling deceived, after the phone call Sue looked up the Herman Law Firm online and

10   found a number of consumer complaints against the firm.

11   132.    In one online complaint, a consumer says he/she was promised that the Herman Law

12   Firm could resolve debts with four companies, but that after over a year in the "program," nothing

13   had been resolved. When the consumer requested a progress report, the only thing the firm did was

14   provide one set of letters sent to the consumer's creditors and call the consumer numerous times to

15   attempt to convince him/her to continue with the program. Moreover, the firm refused to refund

16   any fees, despite the fact that nothing had been done to resolve the consumer's debts as promised.

17   133.    In another online complaint, a consumer offers a detailed account of his interactions

18   with a representative attempting to convince the consumer to sign up for debt relief services from

19   the Herman Law Firm. In the course of an email exchange, the representative evaded many of the

20   consumer's direct questions about the results that could be expected from the program, but made a

21   number of claims such as that "[t]he program . . . provides the best possible outcome out of all the

22   programs available I GUARENTEE [sic] IT!", and that "when compared to ALL other options,

23   THIS IS HANDS DOWN THE BEST PROGRAM AVAILABLE!" (emphases in original).

24   Moreover, the representative's email signature called him a "Consumer Protection Specialist" and

25   gave a "license" number – insinuating that the representative was a "licensed" Consumer

26   Protection Specialist. In reality the number was merely for a "Commercial Telephone Salesperson"

27   license issued by the Florida Department of Agriculture and Consumer Services.

28

134.   The online complaints that Sue found – along with the fact that Paul had effectively bullied Sue into signing up and blatantly misrepresented the nature of the payments Sue was making – convinced Sue that she had been the victim of a scam.

135.   On March 27, 2013, Sue called the paralegal back and asked to cancel her account. The paralegal agreed to cancel her account and told her that no more payments would be deducted by Meracord. Sue contacted her bank to stop the payments, but has not received back any of the $917.23 that Meracord withdrew from her account, despite the fact that she never received any actual debt relief services.

136.   Nearly every step of the interaction between Sue and the Herman Law Firm constituted a blatant violation of the applicable Florida Rules of Professional Conduct:

(a)   Florida prohibits the direct solicitation of clients by an attorney or his agent, Fl. St. Bar Rule 4-7.4(a), yet the Herman Law Firm – through Paul, its agent – called Sue directly after allegedly finding her information "online" and attempted to solicit her business by telling her that the firm could help her manage her overwhelming debt.

(b)   Florida prohibits an attorney from charging any fee generated either by intentional misrepresentation or by direct solicitation in contravention of the rules of professional conduct, Fl. St. Bar Rule 4-1.5(a), yet the Herman Law Firm attempted to charge Sue a $13,500 fee after directly soliciting her business by means of misrepresentations and high-pressure sales tactics.

(c)   Florida prohibits an attorney from charging a "clearly excessive" fee, Fl. St. Bar Rule 4-1.5(a), yet the Herman Law Firm's agreement provides that its $13,500 fee "will be considered non-refundable and paid for services rendered."

(d)   Florida requires that "[u]pon termination of representation, a lawyer shall . . . refund[] any advance payment of fee or expense that has not been earned or incurred." Fl. St. Bar Rule 4-1.16(d). Despite the fact that the Herman Law Firm did nothing to settle Sue's debts as Paul promised, none of the over $900 she paid has been returned.

## IV.   CLASS ALLEGATIONS

137.   Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who, while residing in a Surety Bond State, established or on whose behalf was established an account with Meracord LLC

(or any subsidiary thereof) from which Meracord processed any payments related to any debt relief program. Surety Bond State means any State (including the District of Columbia) where Meracord obtained a surety bond from a Defendant in order to receive a license to act as an escrow agent or money transmitter and where this surety bond has not been cancelled.

138.   Excluded from the Class are Meracord LLC, its officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Meracord LLC has or had a controlling interest.

139.   The members of the Class are so numerous that joinder is impracticable. While the exact number of Class members is presently unknown to Plaintiffs, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are tens of thousands of members in the proposed Class and the total number of class members likely exceeds one hundred thousand.

140.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Meracord Enterprise's conduct in violation of law that is complained of herein.

141.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation.

142.   Certification under Fed. R. Civ. P. 23(b)(3) is appropriate because common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

    (a)    Whether Class members' debt settlement agreements with members of the Meracord Enterprise are *void ab initio*;

    (b)    Whether RICO was violated by Meracord's acts and omissions as alleged herein, including:

        (i)    Whether Meracord violated 18 U.S.C. § 2314, relating to the interstate transportation of stolen property;

        (ii)    Whether Meracord violated 18 U.S.C. § 1341, relating to mail fraud;

(iii)    Whether Meracord violated 18 U.S.C. § 1343, relating to wire fraud; and

(iv)    Whether Meracord violated 18 U.S.C. § 1344, relating to bank fraud.

(c)    Whether standardized fees charged by the Meracord Enterprise are unlawful;

(d)    Whether Meracord's standardized practices with respect to the maintenance and management of Class members' trust accounts violate RICO;

(e)    Whether Meracord conducted or participated in the conduct of the Meracord Enterprise's affairs through a pattern of racketeering within the meaning of 18 U.S.C. § 1962(c).

(f)    Whether Meracord conspired with the other members of the Meracord Enterprise to violate RICO;

(g)    Whether the statute of limitation for Plaintiffs' and Class members' claims should be properly tolled;

(h)    Whether Defendants should be estopped from relying on the statute of limitation for Plaintiffs' claims;

(i)    Whether Meracord's wrongful conduct resulted in economic damage to Plaintiffs and members of the Class, and the amount of said damages;

(j)    The proper measure of disgorgement and/or actual and/or punitive damages and/or restitution; and

(k)    Whether Plaintiffs and Class Members are third party beneficiaries and/or obligees of Meracord's surety bonds;

(l)    The extent of Defendants' surety obligations.

143.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action

## V.    CLAIMS FOR RELIEF

### COUNT I
### (VIOLATION OF 18 U.S.C. § 1962(C))
### (AS AGAINST ALL DEFENDANTS)

144.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

145.    This Count, which alleges substantive violations of RICO, as provided in 18 U.S.C. § 1962(c), is asserted against the Defendants, in their capacity as sureties of Meracord, on behalf of Plaintiffs and the Class.

146.    Plaintiffs, the Class, and Meracord are each "persons" as that term is defined in 18 U.S.C. § 1961(3).

147.    The RICO "enterprise" is an association-in-fact (the "Meracord Enterprise") and consists of Meracord and its Front DRCs, including but not limited to 1st United Consultants, New Life Financial, Lloyd Ward & Associates, Simon & Bocksch, Debt Source Solutions, The Debt Answer, the Law Offices of Paul A. Herman, and others engaging in fraudulent and deceptive practices designed to enroll consumers in useless "debt relief" plans and extract unearned fees from them ("the Meracord Scheme"). The Meracord Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of advancing the Meracord Scheme. Members of the Meracord Enterprise operate businesses that perform services and have business relationships that are distinct from the pattern of racketeering alleged herein.

148.    The Meracord Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce and has an existence apart from the racketeering acts set forth herein.

149.    While Meracord participates in and is a members and part of the Meracord Enterprise, it also has an existence separate and distinct from the Meracord Enterprise. For example, Meracord maintains a business servicing private mortgages that is separate and distinct from the Meracord Enterprise.

150.    In order to increase their revenue and profits, members of the Meracord Enterprise need to enroll a continuous stream of customers into their debt relief programs. The Meracord Enterprise provides that stream by fraudulently inducing Class members to enter into illegal contracts through which members of the Meracord Enterprise extract illegal fees directly from Class members' bank accounts.

151.    A critical component of the Meracord Scheme is the use of the Meracord-provided account management software and the insertion of the Meracord "contracts" into the contracts foisted upon consumers by the Front DRCs. Without these integral steps, the Meracord Enterprise would not have the ability to automatically withdraw thousands of dollars from Class members' bank accounts and then distribute unearned and illegal fees from Class members' escrow accounts.

152.    The members of the Meracord Enterprise share the common purpose of engaging in fraudulent and deceptive practices designed to enroll consumers in useless debt relief plans and extract unearned fees from them. Each of the members of the Meracord Enterprise is rewarded financially based on its abilities to perform its role as a member of the Meracord Enterprise.

A.      **Conduct of the RICO Enterprise's Affairs**

153.    Meracord has, in violation of Section 1962(c) of RICO, conducted or participated in the conduct of the affairs of the RICO Enterprise, directly or indirectly, by making false statements and promises in an attempt to encourage Class members to sign up for debt relief programs through the Meracord Enterprise, and by extracting and processing debt relief payments knowing that the underlying contracts provided for illegal fees and that Class members had signed those contracts based on the fraudulent and deceptive activities of the Enterprise's Front DRCs.

B.      **Meracord's Pattern of Racketeering Activity**

154.    Meracord conducted and participated in the affairs of the above-referenced Meracord Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 2314, relating to the interstate transportation of stolen property; 18 U.S.C. § 1341, relating to mail fraud; 18 U.S.C. § 1343, relating to wire fraud; and 18 U.S.C. § 1344, relating to bank fraud. Meracord's pattern of racketeering likely involved thousands of separate

1    instances of use of the U.S. mails or interstate wire facilities in furtherance of the Meracord

2    Scheme, as well as many instances involving the interstate transmission of potentially millions of

3    dollars in fraudulently obtained fees, which were withdrawn from accounts under the custody and

4    control of financial institutions. Each of these instances constitutes a "racketeering activity" within

5    the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of

6    racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Meracord intended

7    to defraud Plaintiffs, Class members, and other intended victims.

8           155.    Meracord's racketeering activities amounted to a common course of conduct, with

9    similar pattern and purpose, intended to defraud Class members. Each separate instance of

10   racketeering employed by Meracord was related, had similar intended purposes, involved similar

11   participants and methods of execution, and had the same injurious results affecting the same

12   victims, including Plaintiffs and Class members. Meracord has engaged in the pattern of

13   racketeering activity for the purpose of conducting the ongoing business affairs of the Meracord

14   Enterprise.

15   **C.    Meracord's Use of the U.S. Mails and Interstate Wire Facilities in Violation of 18
         U.S.C. §§ 1341 & 1343.**

16

17          156.    Meracord's illegal conduct and wrongful practices were carried out by an array of

18   agents and members of the Meracord Enterprise, working across state boundaries, who necessarily

19   relied upon frequent transfers of documents, information, products, and funds by the U.S. mails

20   and interstate wire facilities. The nature and pervasiveness of the Meracord Scheme, which was

21   orchestrated primarily out of the offices of Meracord and the Front DRCs, necessarily required

22   those offices to communicate directly and frequently with each other and with Class members by

23   the U.S. mails and by interstate wire facilities. On the portion of its website devoted to marketing

24   its debt settlement services, Meracord boasts that it is a licensed "money transmitter" in over forty

25   states.

26          157.    Many of the precise dates of Meracord's uses of the U.S. mails and interstate wire

27   facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and

28

1   cannot be alleged without access to Meracord's books and records. However, Plaintiffs can

2   ascertain when and how their transactions involved the mail and wire facilities and can and have

3   described above several of the occasions on which the RICO predicate acts of mail fraud and wire

4   fraud occurred, and how those acts were in furtherance of the Meracord Scheme.

5          158.   Meracord's use of the U.S. mails and interstate wire facilities to perpetrate the

6   Meracord Scheme involved thousands of communications including telephone, email, and U.S.

7   Mail communications to Class members. Use of the U.S. Mail, email, and telephone systems also

8   occurred on hundreds if not thousands of occasions where members of the Meracord Enterprise

9   communicated among themselves. In addition to these RICO predicate acts, it was foreseeable to

10  Meracord that its Front DRCs would communicate with Class members by the U.S. mails and by

11  interstate wire facilities. Further, Meracord has, in furtherance of the Meracord Scheme,

12  communicated through use of the U.S. mails and by interstate wire facilities with their various

13  offices or divisions.

14         159.   Indeed, Meracord's business model and the ensnarement of Class members in this

15  scheme is predicated upon and relies on use of the interstate wire facilities. Class members often

16  "e-sign" their documents using the Internet (an instrument of interstate commerce) to indicate

17  acceptance of the agreements. Further, the agreements are often then transmitted to Class members

18  over the Internet for them to print on their home computers, or may sometimes be sent to Class

19  members through the U.S. mail system. Examples of such mailings and transmissions with respect

20  to Plaintiffs are set forth in detail above. Thus, for each and every Class member, the initiation of

21  the scheme itself is done through the wires or the mails and involves at the very least the wire or

22  mail communication in which their contracts are delivered to them, and often many other email and

23  phone communications as well.

24         160.   Specifically, Meracord perpetrated the Meracord Scheme against Plaintiffs through

25  interstate mail and wire facilities by sending emails and documents from Washington, Texas, and

26  potentially other states, to Plaintiffs in Arizona, Washington, D.C., Arkansas, California, and

27  Florida.

28

CLASS ACTION COMPLAINT
AND JURY DEMAND                              - 44 -
010262-15 603905 V1

161.   All four Plaintiffs received contracts via the Internet:

    (a)   In May 2012, Deborah received contracts from Chapman and Gordon via email;

    (b)   On March 29, 2011, Donte received his contract with New Life Financial via email;

    (c)   In January 2013, Sue received her contract with the Law Offices of Paul Herman and Meracord via email;

    (d)   In July 2012, Richard received his contract with 1st United Consultants via email.

162.   Meracord and the Front DRCs used email to send Plaintiffs information about their accounts:

    (a)   Donte received at least one notice by email, on November 28, 2011, that Meracord would withdraw his payment of $418.98.

    (b)   On July 23, 2012, Richard received a welcome email and Debt Appraisal Guide from 1st United.

163.   Meracord and the Front DRCs used the U.S. Mail to send Plaintiffs documents:

    (a)   On January 30, 2013, Meracord used the mail to send Sue a letter containing her Meracord account number.

    (b)   In August-October 2012, Meracord used the mail to send Richard notices regarding withdrawals from his account.

    (c)   Between April and December 2011, Meracord used the mail at least nine times to send Donte notices regarding withdrawals from his account.

    (d)   Between May and July 2012, Chapman and Gordon used the mail to send Deborah a packet of documents to send to Wells Fargo.

164.   The mailings and emails to Plaintiffs are typical of the use of the wires and mails to thousands of other Class members.

**D.   Meracord's Interstate Transportation of Stolen Property in Violation of 18 U.S.C. § 2314**

165.   The Meracord Enterprise has developed a scheme, described in the above paragraphs of this Complaint, to obtain money from Class members by fraudulent means.

166.    In furtherance of this scheme, Meracord transmits Class members' monthly payments and fees in amounts exceeding $5,000 in interstate commerce. Meracord does so despite knowing that the authorization for those payments and fees are obtained by fraud.

167.    Specifically, over the course of Plaintiffs' dealings with Meracord, the company transmitted over $3,700 from Donte's bank in Washington, DC, over $2,600 from Deborah's bank in Arkansas, over $9,800 from Richard's bank in California, and over $900 from Sue's bank in Florida, to trust accounts held by Meracord's bank in Washington and/or other states.

168.    On information and belief, Meracord transmits over $5,000 for many of the thousands of Class members in an ongoing pattern that continues with the ensnarement of each additional victim. Indeed, many, if not all, of the Front DRCs require that a consumer have at least $10,000 in debt in order to enroll in the program, which necessitates transfers exceeding $5,000.

**E.    Meracord's Commission of Bank Fraud Under 18 U.S.C. § 1344**

169.    Meracord knowingly executed the scheme described in previous paragraphs of this Complaint ("the Meracord Scheme") to obtain money, by means of fraudulent pretenses, representations, and promises, from Class members' bank accounts, which were under the custody and control of financial institutions.

170.    Specifically, as described above, Meracord, through the Meracord Enterprise, obtained by fraudulent means:

      (a)    Donte's authorization to withdraw money from his bank account, which was under the custody and control of Chevy Chase Federal Savings Bank, a financial institution;

      (b)    Deborah's authorization to withdraw money from her checking account, which was under the custody and control of Arvest Bank, a financial institution; and

      (c)    Richard's authorization to withdraw money from his checking account, which was under the custody and control of U.S. Bank, a financial institution.

      (d)    Sue's authorization to withdraw money from her bank account, which was under the custody and control of Drummond Bank, a financial institution.

171.   On information and belief, the same process involving fraud in obtaining authorization to withdraw money from Class members' bank accounts is repeated in a continuing and ongoing pattern with the ensnarement of each additional Class member victim.

**F.    Damages Caused by the Meracord Scheme**

172.   Meracord's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Class to be injured in their business or property because Plaintiffs and the Class:

    (a)   Paid excessive and unlawful fees;;

    (b)   Would not have entered into those debt relief programs if they had been aware of the fraudulent nature of the scheme devised by the Meracord Enterprise;

    (c)   Paid fees for services that were never performed, and were unable to get refunds for those fees because of the fraudulent and deceptive practices of the Meracord Enterprise;

    (d)   Suffered continuing harm to their credit and creditworthiness as a result of the fraudulent and deceptive practices of the Meracord Enterprise;

    (e)   In many cases, incurred substantial legal fees as a result of the fraudulent and deceptive practices of the Meracord Enterprise, whether in pursuit of refunds from the Enterprise, or in the defense of lawsuits by creditors brought about by Class members' enrollment in the Enterprise's debt relief programs; and

    (f)   In many cases, had judgments entered against them related to their failure to pay their debts as a result of entering into the Meracord Enterprise's debt relief programs – sometimes despite the existence of valid defenses to those debts, including but not limited to statute of limitations defenses.

173.   Plaintiffs were harmed by the Meracord Scheme because had they known: (1) that the fees they would be charged were illegal; (2) that both Meracord and its Front DRCs were deceiving them about the true nature of their relationships; and (3) the true nature of the debt relief programs hidden by the Meracord Enterprise, they would not have entered into the contracts. Instead, they would have either purchased debt relief services elsewhere or, more likely, would have simply attempted to negotiate with their creditors themselves.

174. Under the provisions of Section 1964(c) of RICO, Meracord is liable to Plaintiffs and members of the Class for three times the damages that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

### (VIOLATION OF 18 U.S.C. § 1962(D))
### (AS AGAINST ALL DEFENDANTS)

175. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

176. This Count is asserted against the Defendants, in their capacity as sureties, on behalf of the Class.

177. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

178. Meracord has violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs described previously through a pattern of racketeering activity.

179. Meracord conspired with other affiliates in order to further and perfect the financial goals of the Meracord Enterprise. Meracord had overt written and oral agreements with the Front DRCs and other affiliates to further the goals of the Meracord Enterprise and to engage in the pattern of racketeering activity alleged herein. The nature of the acts, material misrepresentations and omissions in furtherance of the conspiracy gives rise to an inference that Meracord and its affiliates not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

180. As a direct and proximate result of Meracord's and the other Meracord Enterprise members' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business or property.

181.    Meracord and the members of the Meracord Enterprise sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

     (a)    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

     (b)    Multiple instances of mail fraud violation of 18 U.S.C. §§ 1341 and 1346;

     (c)    Multiple instances of transporting fraudulently obtained money in violation of 18 U.S.C. § 2314;

     (d)    Multiple instances of bank fraud in violation of 18 U.S.C. § 1344; and Multiple instances of unlawful activity in violation of 18 U.S.C. § 195.

### LIMITATION OF DAMAGES

182.    Plaintiffs do not presently seek damages from Defendants in the aggregate (including costs and fees) in excess of the face value of the surety bonds issued by Defendants.

183.    Plaintiffs reserve the right to assert a claim of bad faith against Defendants to the extent permitted by law in the event that the full amounts of Defendant's surety bonds are not promptly tendered.

### PRAYER FOR RELIEF

184.    WHEREFORE, Plaintiffs demand judgment as follows:

     (a)    For an order declaring that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure Rule 23, and for an order certifying this case as a class action and appointing Plaintiffs as representative of the Class;

     (b)    For judgment for Plaintiffs and the Class on their RICO claims, and damages in an amount to be proven at trial;

     (c)    For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

     (d)    For an order awarding Plaintiffs and the Class their attorneys' fees and costs;

     (e)    For an order requiring that the damages awarded be paid by Defendants out of the surety bonds posted for the benefit of those harmed by Meracord's wrongdoing; and

     (f)    Such other and further relief as may appear necessary and appropriate.

# DEMAND FOR JURY TRIAL

185.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury on all issues so triable.

DATED: April 23, 2013

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: _____
     Shana E. Scarlett
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Steve W. Berman (*pro hac vice* application to be filed)
Thomas E. Loeser (SBN 202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

**THE PAYNTER LAW FIRM PLLC**

Stuart M. Paynter (226147)
Jennifer L. Murray (*pro hac vice* application to be filed)
1200 G Street N.W., Suite 800
Washington, DC 20005
Tel.: (202) 626-4486
Facsimile: (866) 734-0622
stuart@paynter lawfirm.com
jmurray@paynterlawfirm.com

Celeste H.G. Boyd (*pro hac vice* application to be filed)
Sara Willingham (*pro hac vice* application to be filed)
1340 Environ Way
Chapel Hill NC 27517
Tel: 505-501-8176
Facsimile: (866) 734-0622
cboyd@paynterlawfirm.com
swillingham@paynterlawfirm.com